958 F.2d 881
 Orlean HOPKINS, Individually, and Melba Lazenby-Jenkins as
Administratrix of the Estate of Jerry Stancill,
Plaintiffs-Appellants,
v.
Marc ANDAYA, George T. Hart, and the City of Oakland,
Defendants-Appellees.
 No. 89-16368.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 12, 1991.
Decided March 5, 1992.
As Amended March 24, 1992.
 
 Thomas H. Crawford, San Francisco, Cal., for plaintiffs-appellants.
 Karen A. Silverstein, Asst. City Atty., Jayne W. Williams, City Atty., Oakland, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before D.W. NELSON, KOZINSKI and T.G. NELSON, Circuit Judges.
 PER CURIAM:
 
 
 1
 On the night of May 21, 1984, Marc Andaya shot and killed Jerry Stancill. Appellants Orlean Hopkins, the mother of the decedent and Melba Lazenby-Jenkins, Stancill's daughter, brought this action, alleging claims under 42 U.S.C. § 1983 and 42 U.S.C. § 1988 and the California wrongful death statute. Hopkins and Lazenby-Jenkins appeal the summary judgment granted in favor of defendants/appellees, Marc Andaya, the City of Oakland, the Oakland police department and its police chief. We reverse and remand the district court's grant of summary judgment and its decision to dismiss appellants' pendent California wrongful death claims.
 
 I. Facts
 
 2
 Oakland Police Officer Marc Andaya responded to a call on the night of May 21, 1984 reporting that Jerry Stancill was creating a disturbance at the Capri Motel.[1] Because Stancill had allegedly threatened "to shoot the place up," Andaya searched Stancill and determined that he was unarmed. He then sent Stancill on his way.
 
 
 3
 During this encounter, Andaya observed Stancill acting strangely and talking to himself in an illogical manner. He and a fellow officer followed Stancill and stopped him to determine whether Stancill should be detained for a psychiatric evaluation in accordance with California law. The officers did not detain Stancill because they did not feel that he posed "a threat to himself or others."
 
 
 4
 A short time later, Andaya was completing paperwork in a parking lot when he heard Stancill "howling or braying" under a traffic light. When Stancill began to walk back towards the Capri Motel, Andaya pulled his car into an abandoned lot behind Stancill and sounded his siren. Stancill then approached the car.
 
 
 5
 According to Andaya, Stancill put his hands on the police car in a frisk position, and asked "what are you going to do?" Andaya claims that Stancill's manner then changed: he became hostile and began approaching Andaya in a threatening manner. Andaya testified that he backed away, and drew his baton and began hitting Stancill's arms to keep him away. Andaya then says that Stancill grabbed Andaya's baton and caused him to fall backwards and hit his head on the ground. Andaya says this blow was sufficiently hard to "daze" him.
 
 
 6
 According to Andaya, Stancill then hit him with the baton "at least ten times" in spite of Andaya's efforts to evade the blows. Andaya claims that after a minute or so of repeated blows and kicks to the head or body, he drew his revolver and warned Stancill to stop. Stancill kept attacking, so Andaya shot at him six times at a range of three to four feet in several spaced volleys.
 
 
 7
 Andaya testified that he knew the shots had hit Stancill, since he saw blood and told Stancill "You're hurt. Don't get up." However, he also stated that the shots did not stop Stancill from coming at him. He then managed to bring Stancill to the ground and wrestled with him for about a minute. Andaya then claims he managed to get up and back away, but that Stancill got up as well. With Stancill advancing on him, Andaya claims that he somehow managed to radio for help, throw the radio down, empty the spent cartridges from his revolver and reload it, cross the street and hide behind a car in a gas station on the other side of the street. Once again Stancill advanced on Andaya. After warning Stancill again to stop, Andaya fired four more bullets at close range. Andaya says that Stancill was still standing after the four shots were fired. Andaya does not remember anything else until he was lifted into an ambulance.
 
 
 8
 Jerry Stancill died from nine gunshot wounds: two to the head, five to the torso and one in each hand. The report of the doctor who examined Andaya the night of the shooting indicated that he had bruises on his arms, back, and legs, but not on his head. The medical report also indicated that Andaya's injuries were not serious.
 
 
 9
 The declaration of an eyewitness, Greg Lassonde, contradicts Officer Andaya's testimony in important respects. According to Lassonde, Stancill was indeed pursuing Andaya, and Andaya fell or was pushed backwards. Stancill then leaned over Andaya and began grabbing at him with his hands. According to Lassonde, however, Stancill at no time had possession of the baton and did not hit Andaya with it. Instead, Andaya began firing almost immediately after he fell, without issuing a warning. Lassonde also denies that the two wrestled on the ground after Andaya fired the first six shots. Instead, he claims that Andaya was standing by the time he fired the last shot in the first volley.
 
 
 10
 Andaya has a history of citizen complaints of excessive force, a reputation for being quick-tempered, and has been at the center of several incidents involving inappropriate use of his firearm.
 
 
 11
 Appellants, decedent's mother and daughter, filed this action on May 20, 1987, alleging violations of 42 U.S.C. § 1983 and Cal.Code Civ.Procedure § 377 (wrongful death). Appellees filed a motion for summary judgment on June 2, 1989, relying on the testimony of Officer Andaya and several other members of the Oakland Police Department. Appellants filed their opposition to this motion on June 16, 1989. To bolster their opposition, they attached the medical records and evidence of Andaya's prior and subsequent record in the Department. They did not depose Greg Lassonde, even though he was on appellants' witness list for trial.
 
 
 12
 Without the benefit of any evidence from Lassonde, the district court granted summary judgment for appellees on the section 1983 claims on July 21, 1989. The court dismissed the California wrongful death claim "for lack of pendent jurisdiction." On August 4, 1989, appellants filed a motion for reconsideration which included for the first time the declaration of Greg Lassonde. The court denied this motion on September 29, 1989, and this appeal ensued.
 
 II. Standard of Review
 
 13
 The court reviews de novo a grant of summary judgment. Fed.R.Civ.P. 56; Kruso v. Int'l Tel. & Tel. Corp., 872 F.2d 1416, 1421 (9th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). On summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).
 
 
 14
 The party moving for summary judgment has the burden of proving the absence of any genuine issue of material fact that would allow a judgment as a matter of law. Id., 477 U.S. at 256, 106 S.Ct. at 2514. The court's function on summary judgment is not to make credibility determinations. Id., 477 U.S. at 255, 106 S.Ct. at 2513.[2] The trial judge determines whether the evidence presented is such that a jury applying the evidentiary standard could reasonably find for either the plaintiff or the defendant. Id.
 
 
 15
 However, once the moving party demonstrates the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to produce evidence sufficient to support a jury verdict in her favor. Id., 477 U.S. at 256-257, 106 S.Ct. at 2514-15. In meeting this burden, the nonmoving party must go beyond the pleadings and show "by her own affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
 
 III. Summary Judgment
 
 16
 Apprehension by use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment. Tennessee v. Garner, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985). In Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court held:
 
 
 17
 The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.
 
 
 18
 ....
 
 
 19
 The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation.
 
 
 20
 490 U.S. at 396-397, 109 S.Ct. at 1872 (citations omitted). In determining whether an officer acted reasonably under the Fourth Amendment, we must consider the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id., 490 U.S. at 396, 109 S.Ct. at 1872.
 
 
 21
 Appellants contend that there is a triable issue of fact as to whether Andaya used unreasonable force against Stancill.[3] The question of the reasonableness of force is usually a question of fact for the jury. However, on summary judgment, the court may make a determination as to reasonableness where, viewing the evidence in the light most favorable to Hopkins, the evidence compels the conclusion that Andaya's use of force was reasonable. In the unusual circumstances of this case, two troubling factual issues lead us to conclude that summary judgment is inappropriate.
 
 A. The Medical Evidence
 
 22
 First, the medical evidence in the record undermines Andaya's story in numerous ways. Shortly after the shootings, Andaya was examined by a physician at the emergency room of the Samuel Merritt Hospital in Oakland. The report of that examination makes for informative reading.
 
 
 23
 The medical report starts with an account of Andaya's statement to the medical staff concerning the cause of his injuries:
 
 
 24
 [T]he patient says that he was hit on his head and on his left elbow with a baton. He believes that he was bitten on his right forearm. He also complains of some pain over the right upper leg and the sacral area. He does not believe that he lost consciousness. He has not had any difficulty with vision or nausea or vomiting since the incident.
 
 
 25
 Andaya's statement to the medical staff conflicts in significant respects with his deposition testimony. To the medical staff he complains only of being hit on the head and left elbow with a baton; in his deposition, he claims there were 10-20 blows to all parts of his body, and that he struck his head when he fell backwards. To the medical staff he tells of bites; during his deposition, he says nothing about having been bitten. To the medical staff he says that he does not believe he lost consciousness; in his deposition, he claims he lost consciousness (or nearly lost consciousness) twice: first, at the time he fell backwards and struck his head in the parking lot ("I might have blacked out for a second as my head hit"), and second, after he shot Stancill the second time in the gas station ("The next person I actually remember is my friend, Michael Hallinan. I was getting into the--the ambulance").
 
 
 26
 The medical report containing Andaya's statement to the medical staff was submitted by Hopkins in opposition to the motion for summary judgment; it is competent evidence that the district court may consider under Rule 56(c). In determining the threat Andaya really faced, the jury would be entitled to consider the milder version of the altercation contained in the statement Andaya made closer to the time of the incident: that he was hit only once or twice with the baton; that he never hit his head on the ground; that he never passed out.
 
 
 27
 Given this milder version of the threat Andaya faced, a jury could reasonably conclude that the force he used was excessive. In reaching this conclusion, the jury might well be aided by the substance of the medical report. The report, in its entirety, states as follows:
 
 
 28
 Vital Signs: Blood pressure 118/50, temperature 99.7, respiration § 20.
 
 
 29
 General: The patient is alert and oriented.
 
 
 30
 HEENT: External ocular muscles are intact. Pupils are equal and reactive. Fundi are benign. TMs are clear. There is no tenderness or deformity over the facial bones or the skull.
 
 
 31
 Chest: Clear with breath sounds bilaterally equal.
 
 
 32
 Heart: Regular rhythm without murmur.
 
 
 33
 Abdomen: Soft, nontender with active bowel sounds.
 
 
 34
 Musculoskeletal: There is no tenderness or deformity over the cervical, thoracic spine. There is some tenderness over the lower lumbar spine and the sacral area. There is no deformity. There is no tenderness or deformity over the ribs or the pelvis.
 
 
 35
 Extremities: There is a hematoma over the lateral aspect of the left elbow. There is no deformity or limitation of motion at the elbow. Distal motor, sensory and pulses are intact. There is a superficial laceration of the right forearm which is approximately 1/2 inch in length. The laceration is superficial and not through all layers of the skin. There is no tenderness over the bones of the forearm. Distal motor, sensory and pulses are intact. The left upper leg has a contusion over the lateral aspect. There is otherwise no tenderness or deformity over the lower extremities. X-Rays of the right forearm, the left elbow and the lumbosacral spine, preliminary reading, all negative.
 
 
 36
 ...
 
 
 37
 DIAGNOSIS: Superficial laceration of the right forearm. Contusion of the left elbow, the left lower back and the left upper leg.
 
 
 38
 DISCHARGE INSTRUCTIONS: The patient was instructed to ice his elbow tonight, keep the wound bandaged. He was instructed to see the City Physician tomorrow.
 
 
 39
 (emphases added). Even without the help of experts, a jury could look at this report and conclude that Officer Andaya was never in any serious danger.
 
 B. The Second Shooting
 
 40
 Andaya, according to his own account, used deadly force not once but twice. The first was in the parking lot where the altercation began. Andaya found himself under attack by Stancill, who had gotten ahold of Andaya's night stick and was using it to hit the officer ten or twenty times over his head, back, shoulders and arms. The second use of force occurred several minutes later in the Arco station, after Andaya had managed to break away following the first shooting.
 
 
 41
 Andaya's story, even if believed in every particular, would justify his use of deadly force only the first time, where Stancill was allegedly beating him. While we might question the competence of an officer who is disarmed by a single, unarmed, mentally deranged man, we really can't quibble with his use of deadly force to avoid being bludgeoned to death with his own club.
 
 
 42
 But that is not the crucial shooting, because Stancill was still alive after Andaya emptied his revolver the first time. The critical encounter--the one where Andaya delivered the lethal shot--came later, after what can only be described as a bizarre series of events.
 
 
 43
 According to Andaya, he managed to break away from Stancill after discharging his weapon; Stancill followed at a brisk pace. The baton--the one that had caused Andaya to fear for his life--was gone:
 
 
 44
 Q: Did [Stancill] have anything in his hands?
 
 A: No, sir, not that I could see.[4]
 
 45
 Officer Andaya saw blood on Stancill's body and knew he was wounded, since he yelled to Stancill, "You're hurt. Don't get up." He used his radio to call for backups, gave his location, and threw the radio down. He then emptied the spent cartridges from his gun and reloaded using a speed loader. He crossed MacArthur Boulevard into an Arco gas station. Stancill was still in pursuit but Andaya managed to put a vehicle between himself and Stancill. Stancill still had nothing in his hands, but moved to within a car length of Andaya. Andaya yelled at him to stop and leave him alone, but Stancill kept coming towards him. Andaya then shot Stancill four more times, killing him.
 
 
 46
 Once Andaya managed to break away from Stancill and pepper him with five bullets, the exigency of the situation lessened dramatically. The officer was holding an empty gun, a police radio and a small baton, any of which could have been used as a defensive weapon. He was being pursued by an unarmed civilian he knew was wounded. The officer had the time (and the presence of mind) to use his radio to "put on my call sign and put out a 40B ... Officer down and needs help." He had the time and elbow room to empty his revolver and reload it. He managed to cross a major thoroughfare, reach a gas station and put a car between himself and his assailant.
 
 
 47
 Accepting all of these facts, we cannot say as a matter of law that Andaya acted reasonably when he then shot the unarmed Stancill four more times. At the time of the second shooting, it was far from clear that Andaya reasonably feared for his life. Stancill had been wounded and was unarmed; Andaya was armed with several weapons and could hide behind a car. Andaya had already called for help; he needed only to delay Stancill for a short period of time. He could have evaded Stancill, or he could have attempted to subdue him with his fists, his feet, his baton or the butt of his gun. To endorse Andaya's chosen course of action--firing four more shots--would be to say that a police officer may reasonably fire repeatedly upon an unarmed, wounded civilian even when alternative courses of action are open to him.[5]C. Conclusion
 
 
 48
 While these factual conflicts concerning the sequence of events and the true nature of the threat confronting Andaya might be resolved in Andaya's favor at trial, it is neither our job nor the job of the district court to resolve these conflicts in the evidence on a motion for summary judgment. It is true that only Andaya's first-hand testimony was presented. However, circumstantial evidence can speak clearly and often unequivocally; properly construed, it is as objective and reliable as any other evidence. As a great trial lawyer once said, "We better know there is a fire whence we see much smoke rising than we could know it by one or two witnesses swearing to it. The witnesses may commit perjury, but the smoke cannot." Abraham Lincoln, Unsent Letter to J.R. Underwood and Henry Grider, October 26, 1864, reprinted in The Quotable Lawyer 323 (1986) (Schrager and Frost eds.). We reverse the grant of summary judgment in favor of Andaya.
 
 
 49
 We also reverse the grant of summary judgment in favor of Hart and the City. The district court dismissed the claims against the chief of police and the city on the theory that, if Andaya is not liable, neither are they. Because Andaya may be held liable under our disposition of the case, so may the other defendants. In any event, the police chief and city might be held liable for improper training or improper procedure even if Andaya is exonerated, since they put an officer on the street who is so badly trained and instructed he lets his baton be taken away from him and then has to kill an unarmed civilian to save his own life. Andaya has a history of citizen complaints of excessive force, a reputation for being quick-tempered, and has drawn or fired his gun inappropriately several times before. These facts would certainly bear on whether the city properly trained Andaya, and whether they should have sent him out on the streets carrying a weapon.
 
 IV. Pendent Jurisdiction
 
 50
 Appellants also brought a wrongful death claim under California law. Although appellees did not seek summary judgment on the state wrongful death claim, the district court dismissed the state claim along with the federal claims "for lack of pendent jurisdiction." Because of our disposition of the federal claims, we vacate the dismissal of appellants' state law claims and remand to the district court so that it may determine whether to hear them along with the federal claims at trial.
 
 
 51
 One factor will complicate the district court's evaluation on remand. The statute of limitations for actions under Cal.Code Civ.Procedure § 377 is generally one year. Cal.Code Civ.Procedure § 340. Because this action was filed on May 20, 1987, nearly three years after Jerry Stancill's death, the pendent state claim appears to have been time-barred when filed. However, appellees have never raised this objection at any stage of this proceeding. Under California law, failure to raise a statute of limitations defense promptly constitutes a waiver of that defense. Getz v. Wallace, 236 Cal.App.2d 212, 213, 45 Cal.Rptr. 910 (1965); Ridley v. Young, 64 Cal.App.2d 503, 509, 149 P.2d 76 (1944) (failure to plead statutory bar in either demurrer or answer constituted waiver). It thus appears that, had this claim been filed in California court originally, the statute of limitations objection would have been waived, and the California courts would hear appellants' claim.
 
 
 52
 On remand, the district court should determine whether California courts would have heard this claim if it were filed originally in state court. If so, it should entertain the state claims on remand.
 
 V. Conclusion
 
 53
 The district court's decision to grant summary judgment on appellants' federal claims is reversed and remanded. The decision to dismiss the state claim is reversed and remanded for reconsideration in accordance with this opinion.
 
 
 54
 REVERSED AND REMANDED.
 
 
 
 [1]
 Much of the factual description that follows is taken from the testimony of Officer Andaya, a witness with an obvious interest in the outcome of this case
 
 
 [2]
 Appellants rely upon Cal.Code Civ.Procedure § 437(c) for the proposition that summary judgment is improper where it relies upon the testimony of a party-defendant. This suit is not in California state court, however. The Federal Rules of Civil Procedure, which govern this litigation in federal court, provide that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). According to this rule, deposition testimony can be sufficient as a basis for granting summary judgment
 
 
 [3]
 Police officers are entitled to assert a defense of qualified immunity from section 1983 liability if they reasonably believed in good faith that their actions were constitutional. Smiddy v. Varney, 665 F.2d 261, 266 (9th Cir.1981), cert. denied, 459 U.S. 829, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982). In Fourth Amendment unreasonable force cases, unlike in other cases, the qualified immunity inquiry is the same as the inquiry made on the merits. See, e.g., Curnow v. Ridgecrest Police, 952 F.2d 321, 325 (9th Cir.1991) (defendant in "unreasonable force" case is entitled to qualified immunity if "the totality of the circumstances ... justified the particular type of seizure"). Hunter v. District of Columbia, 943 F.2d 69, 75 (D.C.Cir.1991); Jackson v. Hoylman, 933 F.2d 401, 402-03 (6th Cir.1991); Street v. Parham, 929 F.2d 537, 540-41 & n. 2 (10th Cir.1991). For this reason, we do not consider the qualified immunity issue separately in this case
 
 
 [4]
 Andaya testified to this point more than once:
 Q: At that time, did he have anything in his hands?
 A: No, sir.
 
 
 [5]
 In reaching this conclusion, we do not rely on the affidavit of Greg Lassonde. Lassonde was listed as a witness to the incident in appellants' pretrial statement. Appellants knew of the witness and could have deposed him or submitted his affidavit to contest the summary judgment motion. Appellants offer no excuse for not presenting the affidavit earlier. A defeated litigant cannot set aside a judgment because he failed to present on a motion for summary judgment all the facts known to him that might have been useful to the court. See Northwest Acceptance Corp. v. Lynnwood Equip., 841 F.2d 918, 925-26 (9th Cir.1988) (district court has discretion not to consider claims not raised until motion for reconsideration); Schanen v. United States Dept. of Justice, 762 F.2d 805, 807-08 (9th Cir.1985) (no abuse of discretion to refuse to consider new arguments in Rule 60(b) motion, even though "dire consequences" might result; neglect in failing to respond to summary judgment motion was "inexcusable"), reaffirmed as modified, 798 F.2d 348 (9th Cir.1985); Fay Corp. v. Bat Holdings I, Inc., 651 F.Supp. 307, 309 (W.D.Wash.1987) ("Motions for reconsideration ... are not justified on the basis of new evidence which could have been discovered prior to the Court's ruling;" collecting cases)