34 F.3d 1072
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Richard L. LOCKEN, Plaintiff-Appellant,
v.
PIERCE COUNTY; et al., Defendants-Appellees.
 No. 94-35187.
 United States Court of Appeals, Ninth Circuit.
 Submitted Aug. 23, 1994.*
Decided Aug. 26, 1994.
 
 Before: WALLACE, Chief Judge, HUG and RYMER, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Richard L. Locken, a federal prisoner, appeals pro se the district court's order granting the defendants' motion for summary judgment in his 42 U.S.C. Sec. 1983 action. We review de novo, McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir.1992), and affirm.
 
 Background
 
 3
 Following an investigation of Richard Locken and Barbara Gayle Harrison-Philpot ("Philpot") for suspected cocaine trafficking, the Tahoma Narcotics Enforcement Team ("TNET"),[1] obtained a search warrant for Philpot's residence on April 18, 1988. On April 19, 1988 at approximately 8:00 a.m., TNET officers arrived with a SWAT team at Philpot's residence. After receiving no response at the front door, the SWAT team entered the house, secured the first floor, and took several people into custody.
 
 
 4
 Defendant Adamson and other deputies went up the stairs to secure the second floor. However, on reaching the master bedroom the deputies heard shots fired from within. A male voice, subsequently identified as Locken's, yelled at the deputies to stay away from the room or he would shoot them. Locken also yelled that he would kill Philpot, who was in the room with him. Locken shouted that he would not be taken alive, followed by three more shots. The deputies heard more shots fired towards the walls and the floor of the bedroom.
 
 
 5
 After the first shots were fired from within the bedroom, defendant Smith requested additional SWAT personnel. The additional personnel included professional negotiators who attempted to reach a resolution with Locken upon arrival. One of the residents of the Philpot residence, who had been taken into custody earlier that morning, informed Sergeant Rice, the SWAT team leader, that Locken had a contingency plan to prevent his arrest. Locken intended to "get high" and "play pretend hostage" with Philpot, and use ether and a propane torch to start a fire so they would "get caught with nothing."
 
 
 6
 At approximately 11:30 a.m. an explosion occurred within the house, followed by a strong chemical smell. Deputies positioned outside the house saw smoke coming from the second floor. Philpot yelled that Locken was burning the house down and that she was coming out. Philpot opened the door and saw deputies at the bottom of the stairs. She returned to the room briefly and then left the house and was taken into custody. Shortly after she left, Locken fired shots through the wall towards the bottom of the stairs.
 
 
 7
 As the fire grew, Deputy Jesus Villahermosa received instructions to talk to Locken from outside of the house. Locken kept sticking his head out the window with a gun in his hand. He repeatedly stated that he would kill any officer who attempted to come into the house or attempted to put the fire out. Locken also said he thought the SWAT team was trying to kill him and he would not surrender. At about this time, defendant Smith gave the deputies "the green light" to shoot Locken, but only if "someone was in danger."
 
 
 8
 When the fire became more intense, Locken moved from the second floor to the garage. SWAT team members could hear the sound of a car engine starting up. Locken crashed through the closed garage door in his Corvette; however, the SWAT team van was blocking the driveway. Defendant Adamson saw Locken point a gun at one deputy. Locken then drove back into the garage. Both defendants Adamson and Crockett saw that Locken had a shotgun and a semi-automatic pistol. More shots were fired from within the garage. Defendant Crockett was assigned to the end of the driveway where he attempted to communicate with Locken. Defendant Crockett heard Locken say he was not going to give himself up or be taken alive.
 
 
 9
 When the fire continued to increase in intensity, Locken opened the car door and crawled out towards the front of the garage with the gun in his hand. When Locken started to stand up, defendants Adamson, Crockett and Riehl fired shots at Locken. Some of the shots hit Locken and he fell. Four minutes later, deputies M.G. Hawkins and Mel Ceccanti came forward and dragged Locken away from the fire towards the street. Five minutes later, medical personnel from a waiting ambulance provided Locken with medical care before transferring him to a hospital. The gunshot wounds resulted in severe injuries to Locken's left chest, including destruction of some ribs, a lung, and the chest wall.
 
 
 10
 Subsequently, Locken pleaded guilty to state charges of assault and arson, and federal charges of conspiracy to distribute cocaine, distribution of cocaine, and use of a firearm. Locken filed this civil rights action on January 4, 1993 against three groups of defendants: the Pierce County defendants, the City of Puyallup defendants, and the City of Tacoma defendants. Locken contends that the defendants violated his constitutional rights by using excessive force during his arrest and delaying medical care.
 
 Summary Judgment
 
 11
 The moving party is entitled to judgment as a matter of law when the nonmoving party has failed to make a sufficient showing on an essential element of the case with respect to which the nonmoving party has the burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). There is no genuine issue for trial where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The responding party "may not rest upon the mere allegations or denials of [his] pleading, but ... by affidavits ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir.1989) (citation omitted); see Conner v. Sakai, 15 F.3d 1463, 1467 (9th Cir.1994), petition for cert. filed, 62 U.S.L.W. 3827 (U.S. May 26, 1994) (No. 93-1911).
 
 A. Excessive Force
 
 12
 Whether police officers used excessive force during an arrest is governed by the reasonableness standard of the Fourth Amendment. Graham v. Connor, 490 U.S. 386, 395 (1989); Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir.1991), cert. denied, 112 S.Ct. 2995 (1992). The court must determine whether the officers' actions were objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. Graham, 490 U.S. at 397. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396 (recognizing that police officers often forced to make split-second judgments about amount of necessary force in particular situation). The court must balance the nature and quality of the Fourth Amendment intrusion against the governmental interest at stake, considering such factors as the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. Id. at 396; Hopkins v. Andaya, 958 F.2d 881, 885 (9th Cir.1992) (per curiam); see also Tennessee v. Garner, 471 U.S. 1, 11-12 (1985) (use of deadly force may be reasonable where officer has probable cause to believe suspect poses threat of serious physical harm).
 
 
 13
 Since the question of the reasonableness of force depends on the totality of the circumstances, it is usually a question of fact for the jury. Garner, 471 U.S. at 8-9; Hammer v. Gross, 932 F.2d 842, 846 (9th Cir.), cert. denied, 112 S.Ct. 582 (1991). However, on summary judgment, the court may make a determination as to reasonableness where, viewing the evidence in the light most favorable to the nonmoving party, the evidence compels the conclusion that the officers' use of force was reasonable. Hopkins, 958 F.2d at 885.
 
 
 14
 Here, viewing the evidence in Locken's favor, the defendants' use of force was reasonable. See id. Considering the totality of the circumstances, all three factors weigh in favor of the defendants. See Graham, 490 U.S. at 396. First, turning to the severity of the crime, the defendants had probable cause to believe that Locken was involved in distributing large quantities of dangerous narcotics and that he was armed. In addition, the defendants were informed that Locken had a violent propensity and had "pulled a gun" on uniformed police officers on at least one previous occasion. Second, it is undisputed that Locken was "actively resisting arrest" for more than five hours. During this time, Locken barricaded himself in a bedroom, fired shots, threatened to shoot deputies, refused to surrender even when the fire started, crashed through the closed garage door in a car, and finally left the burning garage still armed.
 
 
 15
 Finally, a reasonable officer on the scene would conclude that Locken posed an immediate safety threat when he left the garage, in light of Locken's behavior over the previous five hours, and the fact that Locken left the garage with a gun after threatening to kill any officer who came near him. Furthermore, the defendants were forced to make split-second judgments in circumstances that were rapidly evolving. See id. at 396-97; cf. Chew v. Gates, No. 91-55718, slip op. 6945, 6965 (9th Cir. June 27, 1994) (suspect posed no immediate threat where police had time for deliberation and consultation with superiors).
 
 
 16
 Moreover, Locken has offered no evidence that the defendants' use of force was unreasonable other than his own self-serving affidavit and the hearsay testimony of witnesses who watched videotapes and saw photographs of the incident. Locken's self-serving statements are not sufficiently probative to survive summary judgment, especially since they conflict with his testimony at Philpot's trial and his guilty plea to assault and arson charges. See Matsushita Elec. Indus. Co., 475 U.S. at 587 (no issue for trial where record taken as whole cannot lead rational trier of fact to find for nonmoving party); Conner, 15 F.3d at 1467.[2] Accordingly, the district court properly granted summary judgment for the defendants on Locken's excessive force claims. See Celotex Corp., 477 U.S. at 323; Hopkins, 958 F.2d at 885.
 
 B. Medical Care
 
 17
 In order to prevail on a Fourteenth Amendment claim for inadequate medical care, a pretrial detainee must show that the defendants exhibited deliberate indifference to his serious medical needs. McGuckin, 974 F.2d at 1059; Jones v. Johnson, 781 F.2d 769, 771 (9th Cir.1986).[3] To determine deliberate indifference, the court must focus on the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. McGuckin, 974 F.2d at 1059. Deliberate indifference may be manifested in two ways: either when prison officials deny, delay, or intentionally interfere with medical treatment, or by the way in which prison physicians provide medical care. Id. Neither negligence nor medical malpractice is sufficient to establish a claim of deliberate indifference. Id.
 
 
 18
 Here, Locken contends that the defendants delayed providing him medical care after he was shot even though an ambulance crew was within 200 feet of the house. Locken contends that nine minutes elapsed between the shooting and the time an ambulance unit was allowed to provide Locken with medical care.
 
 
 19
 Even construing the evidence in Locken's favor, Locken has failed to show that the defendants were negligent, let alone deliberately indifferent to his medical needs. See id. Considering all the circumstances, a nine-minute delay in providing medical care was de minimis. See id.; cf. Hunt v. Dental Dep't, 865 F.2d 198, 200-01 (9th Cir.1989) (prisoner provided sufficient evidence of deliberate indifference to defeat summary judgment where defendants delayed replacing dentures for three months and prisoner had cracked teeth and bleeding gums). Accordingly, the district court properly granted summary judgment for the defendants on Locken's medical claims. See McGuckin, 974 F.2d at 1059.[4]
 
 
 20
 AFFIRMED.
 
 
 
 *
 The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a); 9th Cir.R. 34-4. Accordingly, Locken's request for oral argument is denied
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 TNET is a multi-agency task force comprised of agencies including the Tacoma Police Department, the Puyallup Police Department, and the Pierce County Sheriff's Department. TNET's purpose is to provide a coordinated effort to control illegal drug activity in Pierce County, Washington
 
 
 [2]
 The majority of Locken's statements concern Locken's state of mind and attempt to justify Locken's behavior. However, under Graham 's objective reasonableness standard, the state of mind of either Locken or the defendants is irrelevant. See Ting v. United States, 927 F.2d 1504, 1510 (9th Cir.1991) (emphasizing that standard is an objective one). Assuming the truth of Locken's affidavit, this evidence has no effect on the perspective of a reasonable officer on the scene. See id
 
 
 [3]
 Locken was a pretrial detainee rather than a convicted prisoner at the time the alleged constitutional violation occurred. A pretrial detainee's Sec. 1983 action for inadequate medical treatment arises from the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment prohibition against cruel and unusual punishment. Jones, 781 F.2d at 771. The Eighth Amendment guarantees, however, provide a minimum standard of care for determining a pretrial detainee's rights to medical care. Id
 
 
 [4]
 Since the district court properly granted summary judgment on both of Locken's claims, we need not address the additional claims or defenses raised by the defendants in their individual briefs