**FOUNDATION FOR HORSES AND OTHER ANIMALS, a California non-profit corporation; Lynne Sherman; Barbara Werger; Wendy Penke; and Beverly McCurdy, Plaintiffs,**

v.

**Bruce BABBITT, Secretary of The Interior, United States Department of the Interior; Roger Kennedy, Director of The National Park Service, in his Official Capacity; Timothy Setnicka, Superintendent of Channel Islands National Park, in his Official Capacity; Thomas Gherini, Personally and as Executor of the Estate of Pier Gherini; John Gherini; Pier Gherini, Jr.; Ellen Reis; and Marie Ringrose, Defendants.**

No. CV–97–3520–KMW (RCx).

United States District Court, C.D. California.

Jan. 13, 1998.

---

James R. Nichols, Jr., James R. Nichols Law Offices, Santa Barbara, CA, for plaintiffs.

Leon W. Weidman, John K. Rubiner, Los Angeles, CA, for defendants Bruce Babbitt, U.S. Dept. of Interior and the Redwoods, Roger Kennedy, Timothy Setnicka.

Scott B. Campbell, Rogers Sheffield & Herman, Santa Barbara, CA, for defendants Thomas Gherini, John Gherini, Pier Cherini, Jr., Ellen Reis.

### ORDER GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

WARDLAW, District Judge.

This dispute concerns a group of twelve horses living on a part of Santa Cruz Island in the Channel Islands. Plaintiffs are a non-profit group, Foundation for Horses and Other Animals.[1] Plaintiffs brought this action to enjoin the National Park Service ("NPS") and the other Federal Defendants[2] and

---

1. Plaintiffs include the following individual members of the Foundation: Lynne Sherman, Barbara Werger, Wendy Penke, and Beverly McCurdy.

2. The named Federal Defendants are: Bruce

members of the Gherini family (the "Gherini Defendants")[3], former landowners, from removing the horses from the island. On May 9, 1997, this Court issued a temporary restraining order preventing removal of the horses. On June 16, 1997, this Court issued a preliminary injunction further preventing the removal of the horses during the pendency of this litigation.

The gist of Plaintiffs' complaint is that the NPS failed to follow required procedures by not carefully considering the evidence of the impact of removing the horses, which would have revealed the environmental, scientific, and cultural significance of the continued presence of the horses on the island. Specifically, plaintiffs claim that the NPS violated provisions of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), when it determined that removal of the horses from Santa Cruz Island would not significantly impact the environment.

Federal Defendants bring this motion for summary judgment on four grounds: (1) that plaintiffs' claims are time-barred; (2) that removal of personal property (such as the horses) from a national park is not subject to the NEPA; (3) that the NPS's decision to remove the horses from the Park is categorically excluded from NEPA analysis; and (4) review of the Administrative Record establishes that the NPS's decision to remove the horses was not arbitrary and capricious.

Having considered all the papers and records filed in support of and opposition to this motion, and the oral argument of counsel, the Court hereby **GRANTS** the Federal Defendants' motion for summary judgment. The Court finds that the Administrative Record demonstrates that removal of the horses was not arbitrary and capricious. The Court does not reach the Federal Defendants' other claims.

---

Babbitt, Secretary of the Interior; Roger Kennedy, Director of the National Park Service; and Timothy Setnicka, Superintendent of Channel Islands National Park. These defendants will be referred to as "Federal Defendants."

# I. BACKGROUND

## A. Environmental Review Process

### 1. Overview

This motion turns on this Court's analysis of the Administrative Record. In its decision granting the preliminary injunction, this Court noted that,

[t]he Court's hands are tied by its inability to review the administrative record. Therefore it is impossible for the Court to fully address at this stage of the proceedings the key question before it: whether on the administrative record before the NPS, the decision not to prepare an [Environmental Impact Statement] was arbitrary and capricious.

Preliminary Injunction Order, 8:18–21. Following the issuance of the preliminary injunction order, the Federal Defendants filed with this Court the Certified Administrative Record ("AR").

In 1983 and 1984, the NPS prepared various assessments and plans, including an Environmental Assessment ("EA"), which discussed the goal of the restoration of a natural ecosystem on the island, and the necessity of removing exotic species of animals. In particular, the NPS was concerned that animals which graze, including the horses, threatened the goal of restoring plant species to their natural state. The EA resulted in a Finding of No Significant Impact ("FONSI").

### 2. The Administrative Record

Because of the centrality of the AR to the resolution of this case, the Court sets forth below a detailed description of the critical documents in the AR. These documents bear directly upon whether the Federal Defendants' decision not to prepare an EIS was arbitrary and capricious.

#### a. Federal Defendants' Citations to the AR

The following summarizes those documents that the Federal Defendants offer in support of their position.

---

**3.** The Gherini Defendants are: Thomas Gherini, personally and as executor of the estate of Pier Gherini; John Gherini; Pier Gherini, Jr.; Ellen Reis; and Marie Ringrose.

In June or July of 1983, the NPS circulated a Draft Land Protection Plan. AR 1872. This plan, among other things, recommended the purchase of the Gherini land and discussed the incompatibility of sheep ranching with the NPS goals for the Park. Federal Defendants cite this document as evidence that consideration was given to removing animals from the Park. The Draft Land Protection Plan also included a Draft Environmental Assessment. AR 1926–36. This Draft EA discussed the removal of sheep "and other exotic species" in order to allow vegetation on the island to return to its natural state. AR 1928.

In April 1984, the NPS circulated a Draft General Management Plan/Environmental Assessment ("Draft GMP/EA"). AR 2185. The Draft GMP/EA noted that "exotic animals such as cattle, sheep, elk, deer, swine, and horses will be removed from both Santa Rosa and east Santa Cruz." AR 2218. In addition, the Draft GMP/EA considered alternatives, including no action, to the removal of the animals. AR 2266–67. This alternative was rejected, however, out of fear to the threatened plant species. *Id.*

Federal Defendants also direct the Court's attention to a July 1984 "Statement for Management" in the AR. In that document, the NPS notes that "most natural scientists who have worked on the islands consider the presence of exotic herbivores the major resource management problem, from the aspect of park values, on both Santa Cruz and Santa Rosa islands." AR 2381.

The two most important documents in the environmental review were issued in the fall of 1984. In September of 1984 NPS issued its General Management Plan ("GMP") which superseded the previously discussed Draft GMP. The GMP provides, "[w]hen private lands on eastern Santa Cruz and Santa Rosa have been acquired, ranching and other commercial operations will be discontinued. Any remaining exotic animals such as cattle, sheep, elk, deer, swine, and horses will be removed." AR 2544. In the GMP, the NPS noted that it consulted with the scientific community, landowners, general public and

governmental agencies in developing the GMP. AR 2609–11.

Finally, in October 1984, the Regional Director of the NPS issued the Finding Of No Significant Impact ("FONSI"). AR 0348. The FONSI was an approval of the GMP by the Regional Director. In the FONSI, the Regional Director states that a "major component" of the GMP included acquisition of the eastern portion of Santa Cruz island and thereafter the "reduction or elimination" of exotic species. AR 348. The primary effect of the GMP when completed was the "restoration of more natural conditions to those lands now severely affected by grazing." AR 348. The Regional Director concludes the FONSI by stating, "[b]ased on the analysis of the environmental assessment and public/agency comment, the proposed action is not one which normally requires [preparation of] an environmental impact statement." AR 348.

### b. *Plaintiffs' Citations to the AR*

Plaintiffs assert that the AR shows that the NPS suffered a significant lack of access to the island. Together with delays in acquiring the property, these problems resulted in an arbitrary and capricious FONSI. Plaintiffs show that the NPS was not allowed to visit the island until February of 1982 when they were given a two-day tour. AR 129–132. In a report to the Regional Director after that trip, one ·of the scientists involved noted only "several island foxes and feral pigs" and feral sheep. AR 121. The only mention of horses concerned "about 20" horses that the Gherini's had corralled. AR 121. Apparently, these horses became free-roaming the following year when Francis Gherini ceased sheep farming. These free-roaming horses are presumed to be the ancestors of the 12 horses at issue in this case.[4] A "Draft Public Involvement Brochure" prepared after the visit notes that "NPS policy would normally dictate the removal of feral animals and exotic plant species. However, total elimination of grazing all at one time, might have a detrimental effect." AR 150–51. The Draft GMP/EA, cited by the Feder-

---

4. Indeed, it appears that the NPS may have simply assumed that the twenty corralled horses were property of Francis Gherini and would be removed as a matter of course when the Gherini's land was acquired and dedicated as a National Park.

al Defendants, also notes that the plan for the Park was only conceptual and "additional site-specific studies would then have been required to determine carrying capacities and to evaluate environmental impacts before any actions could be implemented." AR 2204.

In addition to the previously mentioned two-day visit in February 1982, the NPS made only one other visit to San Cruz Island before the FONSI issued—in April 1983. Two scientific reports were written in connection with this visit. Neither of these reports dealt specifically with the environmental effects of the horse population. Indeed, in one of the reports, the "Preliminary Santa Cruz Island Task Force Report," the scientist preparing the report for the NPS, Gary Fellers, notes that, "[t]here are only two exotic mammals ... sufficiently noxious that the NPS should attempt to eliminate them if Santa Cruz Island is acquired. These are wild boar and domestic sheep." AR 0233.

## II. LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A party opposing summary judgment has an affirmative obligation to bring forward evidence "on which the jury could reasonably find for [the nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The mere existence of a scintilla of evidence ... will be insufficient." *Id.* "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d

538 (1986). The non-moving party must "go beyond the pleadings and show 'by her own affidavits, or by the depositions, answers to interrogatories, or admission on file' that a genuine issue of material fact exists." *Hopkins v. Andaya*, 958 F.2d 881, 885 (9th Cir. 1992) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Evidence offered in support of or opposition to a motion for summary judgment must be admissible. *Hal Roach Studios, Inc. v. Feiner & Co., Inc.*, 896 F.2d 1542, 1555 (9th Cir.1989).

## III. ANALYSIS

### A. The NPS took the Requisite "Hard Look" at the Environmental Impact of Removing the Horses

#### 1. Applicable Law: National Environmental Policy Act

Pursuant to NEPA, a federal agency must prepare an EA in an action that may affect the environment. Based on this EA, the agency must determine whether it is required to produce an Environmental Impact Statement ("EIS"), or merely a FONSI. *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1328 n. 4 (9th Cir.1992). An EIS is mandatory when a proposed "major federal action" could "significantly affect[ ] the quality of the human environment." 42 U.S.C. § 4332(2)(C). A "major federal action" is defined as one "with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18. They include "projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies." 40 C.F.R. § 1508.18(a). The "significance" of the effect requires consideration of context and intensity of the proposed action. 40 C.F.R. § 1508.27.[5]

---

**5.** Among the relevant factors considered in the "intensity" evaluation are:
  (1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.... (3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.... (4) The degree to which the possible effects on the quality of the human environment are likely to be highly controversial. (5) The degree to

which the possible effects on the human environment are highly uncertain or involve unique or unknown risks. (6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration. (7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking

In general, NEPA should be interpreted broadly: the "significant effect" language is intentionally broad to force the government to consider the environmental effects of its actions. *Foundation for North American Wild Sheep v. United States Dep't of Agriculture,* 681 F.2d 1172, 1177 (9th Cir. 1982). "The standard for determining whether the implementation of a proposal would significantly effect the quality of the human environment is whether the plaintiff has alleged facts which, if true, show that the proposed project may significantly degrade some human environmental factors." *Wild Sheep,* 681 F.2d at 1177–78; *see also Inland Empire Public Lands Council v. Schultz,* 992 F.2d 977, 980 (9th Cir.1993). The plaintiff does not need to prove that this harm will in fact take place. *Wild Sheep,* 681 F.2d at 1178. When substantial questions are raised as to the impact on the environment, preparation of an EIS is required. *Id.*

### 2. Standard of Review

A federal court reviews an agency's decision whether or not to prepare an EIS under the arbitrary and capricious standard. *Bicycle Trails Council of Marin v. Babbitt,* 82 F.3d 1445, 1456 (9th Cir.1996); *Greenpeace Action,* 14 F.3d at 1330–31.[6] This requires that a court

> ensure that an agency has taken a "hard look" at the environmental consequences of its proposed action. We conduct a "searching and careful inquiry into the facts," carefully reviewing the record to ascertain whether the agency decision is founded on a reasoned evaluation of the relevant factors. If the agency's discretion is truly informed, we must defer to it.

*Inland Empire,* 992 F.2d at 980 (citations omitted); *Environmental Coalition of Ojai v. Brown,* 72 F.3d 1411, 1418 (9th Cir.1995), *cert. denied sub nom. Environmental Coalition of Ojai v. Secretary of Commerce,* 517

U.S. 1245, 116 S.Ct. 2500, 135 L.Ed.2d 192 (1996) (decision not to prepare an EIS is not arbitrary and capricious "if it appears from the record that the Government based its decision on a reasoned evaluation of the relevant factors.").

Judicial review of an agency's decision under NEPA should generally respect agency findings where the procedures required by NEPA were followed. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). "[O]nce an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'" *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227–28, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980) (citations omitted).

Nor should judicial review of an agency decision go beyond the administrative record unless necessary to determine the adequacy of the action. *Ojai,* 72 F.3d at 1414 (limited to administrative record); *Wild Sheep,* 681 F.2d at 1177; *but see Love v. Thomas,* 858 F.2d 1347, 1356 (9th Cir.1988) (recognizing exceptions to the general rule if necessary to explain the basis of the agency action, the factors considered, or technical areas), *cert. denied sub nom. AFL–CIO v. Love,* 490 U.S. 1035, 109 S.Ct. 1932, 104 L.Ed.2d 403 (1989).

### 3. Discussion

The Federal Defendants assert that, "[t]hroughout the certified administrative record, the NPS set forth that it intended to remove exotic animals from the Park and set forth its reasons for doing so." Motion, 30:14–17. The plaintiffs concede that the

---

it down into small component parts. (8) The degree to which the action may … cause loss or destruction of significant scientific, cultural, or historical resources. (9) The degree to which the action may adversely affect an endangered or threatened species.
40 C.F.R. § 1508.27(b).

**6.** This standard in the Ninth Circuit formerly was "reasonableness." *Wild Sheep,* 681 F.2d at 1177

n. 24. The standard was changed by the Supreme Court in *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 376, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989), to arbitrary and capricious. The Ninth Circuit thereafter followed *Marsh. Greenpeace Action,* 14 F.3d at 1330–31; *Inland Empire,* 992 F.2d at 980.

NPS took the requisite hard look at the removal of other animals, including sheep and swine, and therefore the decision to remove those animals would not be arbitrary and capricious. Opposition, 30:6–9. Plaintiffs argue only that Federal Defendants did not meet their obligation to take a "hard look" at the horses independently of the other exotic animals. At the hearing on this motion, counsel for the Federal Defendants conceded that the NPS had not studied horses separately from the other "exotic" animals. Tr., 10:15–17. Rather, the NPS decided to "lump" all exotic animals—the sheep, horses, swine and cattle—together. Tr., 7:22–24. The question on this motion, then, is whether the decision to consider all exotic animals together satisfies NEPA requirements, or whether the NPS should be required to separately examine the impact of removing each different species of exotic animals. Plaintiffs contend that NEPA requires the NPS to "consider every permutation" of species removal. Tr., 12:18–19. Because this interpretation of NEPA is fundamentally at odds with the purpose, construction and practical application of the statute, the Court finds that the Federal Defendants' decision against performing the EIS was not arbitrary and capricious.

As noted above, the NPS is required to prepare an EA if the proposed action may affect the environment. The EA is used to determine whether to produce an EIS or merely a FONSI. The regulatory scheme plainly does not demand a complete EIS in every case. An EA is intended to be a concise and brief public document which provides information for the agency's determination. 40 C.F.R. § 1508.9(a). The EA "cannot be both concise and brief and provide detailed answers for every question." *Sierra Club v. U.S. Forest Service,* 46 F.3d 835, 840 (8th Cir.1995). If the NPS was required to study in depth the potential environmental impact of removing each species individually and every combination of removal of some species, but not others, as the plaintiffs interpret the statute, there would be little point to an EA. Indeed, the Ninth Circuit requires only that the an agency take a "hard look" at the "environmental consequences" of its proposed action. *Inland Empire,* 992 F.2d at 980. Clearly, the NPS is not required to

separately study every species, subspecies or combination of species.

Here, the AR plainly shows that the NPS took a hard look at the environmental impact of removing exotic species, including horses. In the 1980 GMP, the NPS stated that in order to maintain and protect the natural vegetation throughout the island, exotic herbivores had to be removed. AR 1184. In 1983, the NS circulated a Draft Land Protection Plan, including a Draft EA. Those documents discussed removing sheep "and other exotic species" in order to allow vegetation on the island to return to its natural state. AR 1928. In April 1984, the NPS circulated the Draft GMP/EA which further addresses the removal of "exotic animals such as cattle, sheep, elk, deer, swine, and horses." AR 2218. Moreover, the Draft GMP/EA explicitly considered alternatives to removing these species. Among the alternatives considered was a "no action" option which provided that the exotic species would remain on the island. This option was rejected, however, out of fear of harm to the threatened plant species. AR 2266–67.

The GMP, issued in September 1984, clearly considered all exotic species together and contemplated removing them:

> When private lands on eastern Santa Cruz and Santa Rosa have been acquired, ranching and other commercial operations will be discontinued. Any remaining exotic animals, such as cattle, sheep, elk, deer swine, and horses will be removed.

AR 2544. Moreover, the NPS noted in the GMP that it consulted with the scientific community, landowners, general public and governmental agencies in developing the GMP. AR 2609–11.

In their Opposition, plaintiffs argued that the NPS "*never* gave the potential environmental adverse effects that elimination of the [horses] may have on [Santa Cruz Island]." Opposition, 30:13–14. Yet the NPS clearly contemplated leaving the horses and other exotic animals on the island when it considered the "No Action" alternative. Moreover, the plaintiffs fail to address the Federal Defendants' argument that the horses, as herbivores, threaten the NPS's goal of returning native vegetation to is natural state. Plain-

tiffs do not dispute that this is a valid and justifiable goal; rather they simply ignore it. Most importantly, the plaintiffs appear to concede that the NPS had the discretion to remove the horses. "[U]nder the NPS's natural resource management policies in existence in 1984, it had discretion to allow the horses to remain on [Santa Cruz Island]." Opposition, 33:6–7. The discretion to allow the horses to remain clearly encompasses the discretion to remove them.

The record before this Court demonstrates that the NPS's decision to issue a FONSI rather than perform an EIS was not arbitrary and capricious. "It is not the role of this Court to 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'" *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227–28, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980) (citations omitted). It was well within the discretion of the NPS to consider the environmental impact of all the exotic species together. From that standpoint, the NPS took the requisite "hard look" at removing the horses.

Based on the foregoing, the Federal Defendants'[7] motion for summary judgment is hereby **GRANTED.**

**IT IS SO ORDERED.**

---

7. The Gherini Defendants are sued solely in their capacity as "agents and representatives" of the Federal Defendants. Cmplt. ¶ 6. Because judgment is granted in favor of the Federal Defendants, the Gherini Defendants are also entitled to judgment, as their liability cannot exceed that of their principle. *Rookard v. Mexicoach*, 680 F.2d 1257, 1261 (9th Cir.1982).