**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DIANA ISAYEVA,
    *Plaintiff-Appellee*,

    v.

SACRAMENTO SHERIFF'S
DEPARTMENT, Unknown Deputies;
COUNTY OF SACRAMENTO,
    *Defendants*,

    and

SEAN BARRY, Deputy Officer,
Sacramento County Sheriff's
Department,
    *Defendant-Appellant.*

No. 15-17065

D.C. No.
2:13-cv-02015-
KJM-KJN

OPINION

Appeal from the United States District Court
for the Eastern District of California
Kimberly J. Mueller, District Judge, Presiding

Argued and Submitted September 12, 2016
San Francisco, California

Filed October 2, 2017

Before: Ronald M. Gould and Marsha S. Berzon, Circuit Judges, and William K. Sessions III,[*] District Judge.

Opinion by Judge Gould

## SUMMARY[**]

### Civil Rights

The panel reversed the district court's order denying qualified immunity and remanded in an action brought pursuant to 42 U.S.C. § 1983 and state law alleging that Sacramento Sheriff's officer Sean Barry used excessive force when he tased and then fatally shot Paul Tereschenko.

The panel first held that it had jurisdiction over the interlocutory appeal to determine whether, assuming the facts most favorable to the plaintiff (Tereschenko's wife), Deputy Barry violated clearly established law when he tased and then fatally shot Tereschenko.

The panel held that viewing the facts in the light most favorable to the plaintiff, Tereschenko did not have a clearly established right violated by Deputy Barry's use of the taser. Deputy Barry was therefore entitled to qualified immunity for the tasing. The panel noted that Tereschenko, at more than six-feet-tall and 250-plus-pounds was a very big man

---

[*] The Honorable William K. Sessions III, United States District Judge for the District of Vermont, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

who also was likely under the influence of drugs and was violently resisting arrest. The panel further noted that the Deputy Barry only tased Tereschenko once in the less-incapacitating drive-stun mode.

The panel held that there were no existing precedents suggesting that Deputy Barry's use of deadly force violated any clearly established right held by Tereschenko, and therefore Deputy Barry was entitled to qualified immunity for the fatal shooting. Construing the facts in plaintiff's favor, the panel determined that there were strong reasons to believe that Tereschenko posed a risk of death or serious injury to the officers or to the family members in the home. Tereschenko clearly had the upper hand in a hand fight with the officers. After being tased—which failed to immobilize him—Tereschenko had succeeded in freeing both of his arms, in pushing a deputy and, and in pummeling Deputy Barry to the point that he began to pass out. The panel held that even under the view of the facts most favorable to plaintiff, Tereschenko was winning the fight with the deputies, and was doing so quickly, highlighting the risks to Deputy Barry. Under the circumstances, Tereschenko held no clearly established right not to be shot by Deputy Barry. The panel remanded for consideration of state law claims.

**COUNSEL**

Wendy Motooka (argued) and Robert L. Chalfant, Cregger & Chalfant LLP, Sacramento, California, for Defendants-Appellants.

Dale K. Galipo (argued) and Eric Valenzuela, Law Offices of Dale K. Galipo, Woodland Hills, California; Peter Goldstein, Law Office of Peter Goldstein, Culver City, California; for Plaintiff-Appellee.

**OPINION**

GOULD, Circuit Judge:

On February 18, 2013, Sacramento County Sheriff's Deputy Sean Barry tased and fatally shot Paul Tereschenko inside the home of Tereschenko's father-in-law. Tereschenko's wife, Diana Isayeva, brought this action under 42 U.S.C. § 1983 alleging, among other claims, excessive force in violation of the Fourth Amendment. The district court denied summary judgment for Deputy Barry. We reverse and remand, holding that Deputy Barry is entitled to qualified immunity.

**I**

The facts of this case are tragic. They involve a combination of mental illness, drug abuse, and domestic conflict that led to a loss of life in a confrontation between Tereschenko and police officers. They also show the dangers that arise when resistance and a brawl require officers to make split-second decisions.

On February 18, 2013, Deputy Barry and Sacramento County Sherriff's Deputy Corbin Gray responded to two family disturbance calls from the same address in Sacramento, California. The first call came from Tereschenko's brother-in-law, who explained that Tereschenko had moved into the home about a month earlier, that he suffered from mental-health issues including hearing voices in his head, and that he was now refusing the family's requests to move out. The second call came from Tereschenko himself, who complained about being told to leave the house. The deputies' dispatch readout described Tereschenko as "rambling" and "talking about random things," but stated that no weapons were involved in the dispute. The deputies each carried a taser and a firearm, and Deputy Barry also carried pepper spray.

Upon arrival, the deputies met two family members outside the home, one of whom was Tereschenko's brother-in-law, the person who first called 911. The family members told the deputies that Tereschenko was rambling and speaking nonsense; that he was mentally ill or possibly was mentally ill; that they believed he was under the influence of methamphetamine; and that they did not think that he had any weapons. They requested that the deputies remove Tereschenko from the house. At his deposition, Deputy Barry recalled that the family members told him Tereschenko had asked them to kill his wife, Isayeva. But during an interview on the day of the incident, Deputy Barry explained it differently: He said that the family members outside the house said Tereschenko had told them about hearing voices in his head, and that the voices talked about family members killing Isayeva—not that Tereschenko urged the family members to kill his wife.

The deputies entered the house, and, once inside, spoke with Isayeva's father.  According to Deputy Barry, the father said something along the lines that Tereschenko "had stated he wanted to kill [Isayeva]."

The deputies went into a nearby bedroom, where they found Tereschenko and Isayeva.  Tereschenko was large, standing over 6 feet tall and weighing more than 250 pounds.  His skin was pockmarked, he was sweating profusely, he spoke quickly, and he moved his hands rapidly.  The deputies testified that these physiological symptoms indicated drug use, particularly methamphetamine.

The deputies spoke with Tereschenko for about seven to ten minutes.  During the conversation, Tereschenko told the deputies that he was schizophrenic and had been in a mental institution.  Rambling, he talked about Ukrainian money and asked that he be taken to an embassy or consulate.  He asked the deputies to "[p]lease help [him]," and said "I don't know what to do."  The deputies repeatedly told Tereschenko to sit down and to calm down.  In response, he would sit but then stand back up again.  Eventually, Tereschenko stayed seated while the deputies questioned him.

Deputy Barry asked Isayeva whether Tereschenko used any drugs or was diagnosed with any mental illnesses.  She said no and shook her head.  Deputy Gray left the room briefly to ask a family member when Tereschenko made his comments about hearing voices and killing Isayeva, and confirmed that it was earlier that same day.  While Deputy Gray was out of the room, Tereschenko began speaking again and, in Deputy Barry's words, "started to become agitated a little bit."  At Deputy Barry's request, Isayeva stepped out of the room, though she remained by a partially open door where she could still hear and to some extent see what was happening inside the bedroom.  Once Isayeva left,

Tereschenko got down on his knees and, according to Deputy Barry, said "you're gonna have to shoot or kill me."

The deputies decided to detain Tereschenko pursuant to California Welfare Institutions Code § 5150. This statute allows peace officers in California upon probable cause to take into custody for evaluation or treatment, for up to 72 hours, a person who is a danger to himself or others due to a mental health disorder. *See* Cal. Welf. & Inst. Code § 5150(a).

Deputy Barry told Tereschenko that he was not being arrested, only detained to be taken to a hospital. He then asked Tereschenko to turn around and face the wall. According to Deputy Barry, Tereschenko said "no, no," and stepped forward towards a wall off to the side. Deputy Gray recounted that Tereschenko at first complied by turning around and facing the wall behind him, but then kept turning back around, so Deputy Barry had to give his order to face the wall five times.

Deputy Barry grabbed Tereschenko's left arm. Deputy Gray explained that this move was in response to Tereschenko suddenly reaching for something past Deputy Barry, though Deputy Gray did not think the reach was a violent gesture. Deputy Gray then grabbed Tereschenko's right arm and tried to put it in a control hold by locking Tereschenko's wrist. Tereschenko stiffened both arms and resisted the attempts to move them. Both deputies told Tereschenko to "stop resisting." With Deputy Barry at 5 foot 7 inches and 185 pounds and Deputy Gray between 5 foot 10 and 5 foot 11 inches and 195 pounds, Tereschenko was considerably larger than each of the deputies. Deputy Barry described the moment: "we were just being tossed around while still hanging onto [Tereschenko]." Through the open doorway, Isayeva saw Tereschenko "push[] a little

bit the officers" while trying to "get his hands free or something." Deputy Barry said the struggle lasted "a few seconds," while Deputy Gray remembered it going on for about fifteen seconds.

Deputy Barry next tased Tereschenko between his shoulder blades in "drive-stun mode"[1] for a five-second cycle. Deputy Gray and Isayeva remember Deputy Barry warning Tereschenko that he was going to tase him. But Deputy Barry recalled giving no such warning.

Through the open doorway, Isayeva saw Tereschenko react violently to the tasing by going "extremely wild" and screaming "like an animal" that was "wounded." Deputy Barry at once lost control of Tereschenko's arm and flew up against a wall. It is disputed whether Tereschenko purposely threw Deputy Barry or inadvertently "bucked" him into the wall. According to Deputy Gray, Tereschenko then punched him in the face "so hard[ that he] flew back and fell" into several birdcages along one wall. Deputy Barry saw Deputy Gray get thrown across the room but did not see him get punched.

Tereschenko turned back to Deputy Barry and hit him repeatedly in the head, face, neck, and back. As Deputy Barry received punches, his vision became hazy and tunnel-like; he started to pass out. The deputy jumped backwards towards a bed, where he could see Tereschenko still "continuing towards" him with "balled fists" in the air. Deputy Gray got up from the ground and saw Tereschenko standing over Deputy Barry. Tereschenko was throwing

---

[1] Drive-stun mode involves pushing two electrode contacts directly against the individual and delivering an extremely painful electric shock. *Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011).

punches at the deputy while Barry lay on his back on the bed, though Deputy Gray could not see whether any of the punches landed, and does not remember whether Tereschenko's fists were balled at the time. Deputy Gray tried to reengage Tereschenko by jumping on his back and trying to place him in a "carotid hold,"[2] but Tereschenko pushed the deputy off. From her position outside the room, Isayeva did not see Tereschenko punch either of the deputies, but she heard "very deep screaming."

Now the brawl turned deadly. After being thrown off by Tereschenko, Deputy Gray heard Deputy Barry yell "Shoot him. Shoot him." Isayeva remembers hearing something like "I'm going to shoot," but Deputy Gray disputes that Deputy Barry used those precise words. According to Deputy Barry, he just yelled "Shoot him."

Deputy Gray stood up and began to unholster his gun. Right then Deputy Barry, still seated or lying on the bed with Tereschenko standing close in front of and possibly advancing toward him, fired three shots, killing Tereschenko.

Deputy Barry had visible injuries including bruises and swelling around his eyes, bruising and redness to his left ear, and bruising at the base of his neck. After an interview on the shooting, Deputy Barry developed nausea and went to

---

[2] A carotid hold involves the officer placing his or her arm around the individual's neck to "constrict[] blood flow through the carotid artery, which supplies oxygenated blood to the brain." *Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1143 (N.D. Cal. 2009), *amended in part* (Sept. 8, 2009). If successful, "[u]nconsciousness occurs, which causes the individual's body to relax completely, but breathing continues uninterrupted." *Id.*

the emergency room, where he was diagnosed with a non-serious head injury.

Isayeva filed this civil rights action under 42 U.S.C. § 1983 against Deputy Barry and the County of Sacramento, alleging, among other claims, that Deputy Barry used excessive force both when he tased and when he shot Tereschenko. The district court denied summary judgment for Deputy Barry, concluding that genuine disputes of material fact precluded judgment on both the merits of the claim and on qualified immunity.

Deputy Barry filed this interlocutory appeal, challenging the district court's ruling on qualified immunity.

## II

We begin by addressing our jurisdiction to hear this appeal. Under 28 U.S.C. § 1291, we normally have no jurisdiction to hear interlocutory appeals from the denial of summary judgment. *See, e.g.*, *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 43 (1995). But an exception arises where the movant was denied summary judgment based on qualified immunity. *Knox v. Sw. Airlines*, 124 F.3d 1103, 1106 (9th Cir. 1997). Under the collateral order doctrine, such denials are considered appealable "final decisions" because "[q]ualified immunity is immunity from suit, not just a defense to liability." *Id*. The immunity "is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). A subsequent appeal from final judgment does not provide effective review. *Id.* at 526–27.

Our jurisdiction does not extend to all denials of qualified immunity on summary judgment. We do not have jurisdiction to decide whether there is a genuine issue of

material fact. *See Ames v. King Cty.*, 846 F.3d 340, 347 (9th Cir. 2017) ("Where the district court has determined the parties' evidence presents genuine issues of material fact, such determinations are not reviewable on interlocutory appeal."). We do, however, have jurisdiction to decide whether, taking the facts in the light most favorable to the non-moving party, the defendants are entitled to qualified immunity—that is, we may "review a denial of qualified immunity where a defendant argues . . . that the facts, even when considered in the light most favorable to the plaintiff, show no violation of a constitutional right, or no violation of a right that is clearly established in law." *Id.*

In *Maropulos v. County of Los Angeles*, we encouraged district courts to help us evaluate our jurisdiction by "articulat[ing] the basis upon which they deny qualified immunity." 560 F.3d 974, 976 (9th Cir. 2009) (per curiam). Here, the district court stated in its order denying summary judgment that genuine disputes of material fact existed regarding whether the tasing and shooting were reasonable uses of force, and that those disputes of fact precluded ruling that Deputy Barry was entitled to qualified immunity. Then, in an order certifying this appeal as frivolous, the district court characterized its summary judgment ruling as resting on the determination that there are genuine issues of material fact, and concluded that Deputy Barry's appeal was frivolous.

But the district court misapplied the law on qualified immunity. We must accept the district court's determination that there is a genuine dispute as to the circumstances under which Deputy Barry tased and shot the decedent. But, contrary to the district court's reasoning, the existence of a genuine dispute about the reasonableness of an officer's use of force does not preclude granting qualified immunity or

eliminate any basis for an immediate appeal of denial of qualified immunity. *See, e.g.*, *Mattos v. Agarano*, 661 F.3d 433, 446 (9th Cir. 2011) (en banc). Qualified immunity involves two questions: (1) whether the defendant violated a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Thus, as we recently explained, an officer may be denied qualified immunity at summary judgment in a Section 1983 case "only if (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood [his] conduct to be unlawful in that situation." *Hughes v. Kisela*, 862 F.3d 775, 783 (9th Cir. 2016) (quoting *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011)). Either prong can be adjudicated on appeal by taking the facts as most favorable to the plaintiffs and applying the pertinent legal standards to those facts. *See, e.g.*, *Pearson*, 555 U.S. at 236 (holding, in a case involving a qualified immunity determination at summary judgment, that appellate judges may adjudicate the two prongs in either order, according to "their sound discretion"); *Mitchell v. Washington*, 818 F.3d 436, 446–47 (9th Cir. 2016) (adjudicating both prongs on summary judgment); *Tarabochia v. Adkins*, 766 F.3d 1115, 1121–28 (9th Cir. 2014) (same); *Mueller v. Auker*, 576 F.3d 979, 993–98 (9th Cir. 2009) (same). We have jurisdiction over the current appeal on that basis.

The conclusion that our jurisdiction is proper is reinforced by looking at the issues Deputy Barry raises on appeal. *See, e.g.*, *Mattos*, 661 F.3d at 439 n.2 (concluding that jurisdiction is proper in part based on the issues raised by the officers). Deputy Barry contends that his use of both

(a) the taser, and (b) deadly force, against Tereschenko did not violate clearly established law.  We assume the facts most favorable to the plaintiff, and have jurisdiction to address (1) whether Deputy Barry violated clearly established law when he tased Tereschenko; and (2) whether Deputy Barry violated clearly established law when he fatally shot Tereschenko.

## III

We review the district court's conclusions regarding qualified immunity *de novo*.  *Robinson v. Prunty*, 249 F.3d 862, 865–66 (9th Cir. 2001).  Again, we consider all disputed facts in the light most favorable to the nonmoving party, Isayeva.  *See Glenn v. Washington Cty.*, 673 F.3d 864, 870 (9th Cir. 2011).

## IV

Qualified immunity protects government officials from suits for money damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Hughes*, 862 F.3d at 782 (internal quotation marks omitted).  Once the official pleads qualified immunity, the burden is on the plaintiff to prove two elements: (1) that the right was violated; and (2) that the right was clearly established at the time of the alleged misconduct.  *Mattos*, 661 F.3d at 440; *Tarabochia*, 766 F.3d at 1125.  We have discretion to choose which qualified immunity prong to address first.  *Pearson*, 555 U.S. at 236.  Here, Deputy Barry stresses the second prong, whether Tereschenko's rights not to be subject to the tasing and to the shooting were "clearly established" on February 18, 2013.  We address that prong first and, given our conclusion, need not address the other.

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted).  While "officials can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), "existing precedent must have placed the statutory or constitutional question beyond debate," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix*, 136 S. Ct. at 308 (internal quotation marks omitted).

Deputy Barry contends that his use of a taser and of deadly force did not violate clearly established Fourth Amendment prohibitions against the use of excessive force. Under the Supreme Court's leading case, *Graham v. Connor*, determining whether the use of force to effect a seizure was unreasonable under the Fourth Amendment— and therefore unlawful—requires "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  490 U.S. 386, 396 (1989) (internal quotation marks omitted).   In evaluating the governmental interest, we generally consider factors including (a) the severity of the suspect's alleged crime; (b) whether the suspect posed an immediate threat to the officers' safety; and (c) whether the suspect was actively resisting arrest or attempting to escape. *Newmaker v. City of Fortuna*, 842 F.3d 1108, 1116 (9th Cir. 2016).  Other factors relevant to the reasonableness of force "include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they

used force against was emotionally disturbed." *Glenn*, 673 F.3d at 872. Of all these considerations, the "most important" is "whether the suspect posed an immediate threat to the safety of the officers or others." *S.B. v. Cty. of San Diego*, — F.3d —, No. 15-56848, 2017 WL 1959984, at *4 (9th Cir. May 12, 2017) (internal quotation marks omitted). When an officer uses deadly force, this factor becomes a strict requirement: the officer must have "probable cause to believe that the suspect poses a significant threat of death or serious physical injury." *Tennessee v. Garner*, 471 U.S. 1, 3 (1985).

But these general standards are only the starting point. The dispositive question is "whether the violative nature of *particular* conduct is clearly established." *Mullenix*, 136 S. Ct. at 308 (internal quotation marks omitted). This question must be answered "not as a broad general proposition," but with reference to the facts of specific cases. *Id.* (internal quotation marks omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. In typical cases, the plaintiff "identif[ies] a case where an officer acting under similar circumstances as [the defendant] was held to have violated the Fourth Amendment." *S.B.*, 2017 WL 1959984, at *6 (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam)). In the absence of "a case directly on point," we compare "specific factors" relevant to the excessive force inquiry to determine whether a reasonable officer would have known that the conduct in question was unlawful.[3]

---

[3] Of course, in a case where the conduct is "obvious[ly]" unlawful, we do not require similarly "obvious" precedent to clearly establish the law. *Hughes*, 862 F.3d at 785 (internal quotation marks omitted). If that were the standard, "officers would escape responsibility for the most

*Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010); *see also Hughes*, 862 F.3d at 779–80 (enumerating factors relevant to determining whether an officer's actions are objectively reasonable).

## A

We begin with Deputy Barry's use of the taser. The district court found two genuine factual disputes that are relevant to the reasonableness of the tasing. One was whether Tereschenko urged others to kill Isayeva or merely heard voices saying someone was going to kill her. The other dispute was whether Deputy Barry gave a warning before tasing Tereschenko. Remaining within the bounds of our jurisdiction, we accept the district court's findings that these factual disputes are genuine and supported by the record. *See George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013).

But resolving these disputes in Isayeva's favor and granting her all reasonable factual inferences, the record up to the tasing shows this: Deputies Barry and Gray responded to a domestic disturbance call about an individual with possible mental health issues who was refusing to leave a home. Deputy Barry learned that Tereschenko was unarmed, but might have been under the influence of methamphetamine and earlier was hearing voices in his head mentioning the killing of others. Tereschenko's appearance and mannerisms confirmed that he was probably high on methamphetamine or other drugs. At over six feet tall and more than 250 pounds, he was larger than each of the

---

egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct." *Deorle v. Rutherford*, 272 F.3d 1272, 1275 (9th Cir. 2001).

deputies. While speaking to the deputies for seven to ten minutes, Tereschenko asked for help, mentioned that he was schizophrenic, and rambled about random topics. He was eventually compliant with the deputies' requests to sit, though he later started to become agitated and said "you're gonna have to shoot or kill me." Deputy Barry told Tereschenko that he was going to take him to a hospital and asked him to turn around. Tereschenko initially complied, but kept turning back around. Fearing that Tereschenko was reaching for something, Deputy Barry grabbed one of his arms. Deputy Gray grabbed the other. Tereschenko stiffened his arms and tried to get his hands free by pushing the officers and resisting Deputy Gray's attempt at a control hold. Both deputies told Tereschenko to stop resisting. The deputies struggled with the resisting Tereschenko, who was tossing them around. Then, Deputy Barry tased Tereschenko in drive-stun mode for a five-second cycle.

As of February 18, 2013, the date of the incident, three key published cases from the Ninth Circuit established when the use of a taser was unreasonable under the Fourth Amendment.

The first is *Bryan v. MacPherson*. The plaintiff in *Bryan* was a possibly-mentally-ill twenty-one-year-old male pulled over for failing to wear his seatbelt. *Id.* at 822, 829. After not hearing the officer's command to stay in his vehicle, the plaintiff exited his car. *Id.* at 822. He was visibly upset, shouting gibberish and cursing, but made no threatening statements. *Id.* Without warning, the officer tased the plaintiff once in "dart mode,"[4] causing the plaintiff to lose

---

[4] Dart mode involves propelling a pair of metal darts at a rate of more than 160 feet per second and delivering a 1200-volt electrical

muscle control and fall face first to the pavement, knocking out four teeth. *Id.* at 822–24. Construing the facts in the light most favorable to the plaintiff, at the time of the tasing he was standing fifteen to twenty-five feet away from the officer, facing the other direction, and not moving. *Id.* at 823. Viewing the facts in that manner, we held that the tasing violated the Fourth Amendment. *Id.* at 833.

Both Tereschenko and the plaintiff in *Bryan* were unarmed and were tased without warning. Both were possibly mentally ill, were agitated, and failed to comply with at least one law enforcement command. And neither had committed a serious crime.

However, important features distinguish the two uses of force. For starters, *Bryan* involved a greater degree of force. Deputy Barry used the taser in "drive-stun mode," which delivered an electric shock to Tereschenko that, while undoubtedly painful, did not override his central nervous system or result in temporary paralysis, as did the "dart mode" tasing in *Bryan*. *See Mattos*, 661 F.3d at 443. There is also no indication from the record that Tereschenko's tasing injured him, while the *Bryan* plaintiff's tasing led to four missing teeth and facial abrasions—injuries that, we concluded, a reasonable officer would have foreseen. *See Bryan*, 630 F.3d at 824.

Perhaps most importantly, Tereschenko also posed a greater and more immediate threat. He was engaged in a struggle with the deputies, physically resisting them, and indeed was tossing them around, while the plaintiff in *Bryan* was fifteen to twenty-five feet away facing the opposite

---

charge that instantly overrides the recipient's central nervous system, causing temporary paralysis. *Id.* at 824.

direction. Deputy Barry also had reason to believe that Tereschenko was under the influence of drugs, which indicated that he might be less willing or able to control himself. There was no reason to believe the same for the plaintiff in *Bryan*.

Because of these differences, *Bryan* would not have put Deputy Barry on notice that tasing Tereschenko amounted to unconstitutionally excessive force.

The next two cases, *Brooks v. City of Seattle* and *Mattos v. Agarano*, were heard together as consolidated appeals before an en banc panel of this court. *See Mattos*, 661 F.3d 433. In *Brooks*, the plaintiff was a seven-months-pregnant woman who was pulled over for speeding. *Id.* at 436. After she refused to sign a traffic citation and to exit her car, one of three officers present held up a taser and asked if the plaintiff knew what it was. *Id.* at 437. The plaintiff indicated that she did not. *Id.* Another officer grabbed the plaintiff's arms and tried to remove her from the vehicle, but the plaintiff "stiffened her body and clutched the steering wheel." *Id.* The first officer then tased the plaintiff in drive-stun mode three separate times within less than a minute. *Id.*

In *Mattos*, the plaintiff was a woman involved in a domestic dispute with her husband. *Id.* at 438. Three officers responded, and the plaintiff's husband, who was large and smelled of alcohol, began yelling at them. *Id.* at 438–39. One officer tried to arrest the husband, but the plaintiff stood between the officer and her husband and did not move. *Id.* at 439. As the officer moved forward, the plaintiff extended her arms to prevent him from running into her chest. *Id.* He asked, "Are you touching an officer?" *Id.* The plaintiff tried to calm the officers and her husband down so as not to wake her sleeping children, but then one of the

officers, without warning, tased the plaintiff once in dart mode. *Id.*

In both *Brooks* and *Mattos*, we held that when the record was construed in the plaintiff's favor the use of the taser was unreasonable under the Fourth Amendment. *Id.* at 452.

There are some similar facts. Tereschenko was not armed. Nor were the plaintiffs in *Brooks* and in *Mattos*. None of these plaintiffs had committed a serious crime. And none was given an adequate warning. Tereschenko and the plaintiff in *Brooks* both resisted the officers by stiffening up. And all three plaintiffs tried to frustrate the officers by plaintiffs' physical efforts.

But the resistance from Tereschenko posed a much greater threat to the officers than did that of the plaintiffs in *Brooks* and *Mattos*. Tereschenko was a very big man. As we previously said, he was a more than six-foot-tall and more than 250-pound man who was sought to be detained by two much smaller officers. This disparity in size posed obvious risks of physical harm to the officers. In both *Brooks* and *Mattos*, the person tased was a woman—one of whom was seven-months pregnant—and the tased woman was confronting three officers. The plaintiff in *Mattos*, who merely extended her arms, gave the officer far less physical resistance than did Tereschenko, who was strong enough to toss the deputies around and frustrate their physical efforts to constrain him. And Tereschenko's violent resistance came with the deputies' knowledge that Tereschenko was likely under the influence of drugs. The plaintiffs in *Brooks* and *Mattos* were—as far as the records showed—sober.

The nature of the government's intrusion was also more severe in both *Brooks* and *Mattos* than what had occurred in this case at the time of the tasing. In *Brooks*, the officer tased

the plaintiff three times in less than a minute, while Deputy Barry tased Tereschenko only once. In *Mattos*, the officer tased the plaintiff once in dart mode, not in the less-incapacitating drive-stun mode that Deputy Barry deployed against Tereschenko.

These differences show that neither *Brooks* nor *Mattos* clearly established on February 18, 2013 that tasing Tereschenko would violate the Fourth Amendment. Nor do the two cases in combination with each other or with *Bryan* put the constitutionality of Deputy Barry's actions "beyond debate." *al-Kidd*, 563 U.S. at 741. Viewing the facts in the light most favorable to the plaintiff Isayeva, we hold that Tereschenko did not have a clearly established right violated by Deputy Barry's use of the taser. Deputy Barry is therefore entitled to qualified immunity for the tasing. We need not and do not reach the first prong of qualified immunity, asking whether Deputy Barry's use of the taser was reasonable under the Fourth Amendment. *See Pearson*, 555 U.S. at 236. It is sufficient for purposes of qualified immunity merely to conclude that no clearly established law was violated by Deputy Barry in connection with his use of a taser against the resisting Tereschenko.

## B

We next address Deputy Barry's subsequent use of deadly force against Tereschenko. The district court found two genuine factual disputes that are relevant to the reasonableness of the shooting. First, it found disputed whether, immediately after being tased, Tereschenko had purposely thrown Deputy Barry against a wall or merely had inadvertently "bucked" him into a wall. Second, the district court found disputed whether Tereschenko subsequently punched, pushed, or threw Deputy Gray.

The district court also found that several facts were not subject to genuine dispute.  It found that no evidence supported that Tereschenko at any point had reached for a weapon, and that no evidence showed that Tereschenko was standing still when shot.**[5]**  It also found that while there was a dispute over whether Deputy Barry said "I'm going to shoot," it was undisputed that he at least yelled "Shoot him." We accept these factual findings by the district court.  *See George*, 736 F.3d at 834.

Construing all disputed facts in Isayeva's favor, we summarize the record after the tasing as follows:  The shock from the tasing caused Tereschenko to buck Deputy Barry into a wall.  Tereschenko then turned to Deputy Gray, and pushed him backwards.  Tereschenko was screaming like a wounded animal.  He repeatedly hit Deputy Barry on the head, neck, and back.  Deputy Barry was losing consciousness when he jumped backward onto the bed. Tereschenko continued to move towards him with balled fists in the air.  Deputy Gray jumped on Tereschenko's back and tried to put him in a chokehold, but Tereschenko pushed him off.  Deputy Barry yelled "Shoot him."  With Tereschenko still moving towards him, Deputy Barry fired three shots, killing Tereschenko.  Deputy Barry was banged up quite a bit by the struggle.  He sustained cuts and bruises around his eyes, ears, and the base of his neck, as well as a minor head injury.

---

**[5]** Although a decedent's version of events may be constructed circumstantially from "inconsistencies in the testimony of law enforcement," *George*, 736 F.3d at 834, the district court declined to credit a potential inconsistency in Deputy Barry's testimony about whether Tereschenko was standing still or was advancing when he was shot.

Isayeva contends that, under these circumstances, *Garner* clearly established that the shooting was unreasonable. She emphasizes *Garner*'s requirement that officers may not use deadly force absent "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." 471 U.S. at 3. She argues that Tereschenko posed no such threat of death or serious injury.[6] But there are no existing precedents, including *Garner*, suggesting that Deputy Barry's use of deadly force violated any clearly established right held by Tereschenko.

The standards from *Garner* and *Graham* "are cast at a high level of generality," so they ordinarily do not clearly establish rights. *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). Rather, it is the facts of particular cases that clearly establish what the law is. *See White*, 137 S. Ct. at 552. *Garner* involved an officer shooting an individual to stop him from escaping a non-violent crime scene over a chain link fence. 471 U.S. at 3–4. That is quite different from an officer shooting an individual while enmeshed in, and on the losing end of, a serious fight with an opponent who is bigger than the shooting officer and possibly high on drugs. The officer in *Garner* had little reason to think that if the suspect escaped over the fence, he would pose any threat of death or serious physical injury to himself or to anyone else. *See id.* at 21. In sharp contrast, Deputy Barry took repeated blows to the head and was losing consciousness, giving him reason to believe that serious injury to himself or to Deputy Gray— or possibly to the other family members in the house,

---

[6] At oral argument, Isayeva's counsel stated that she was also proceeding on a "provocation theory" of liability. The Supreme Court recently held that the Fourth Amendment provides no basis for such a theory. *See Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1544 (2017).

including Isayeva standing just outside the door—could result if Tereschenko was not stopped.

There is an exception to the rule that the *Garner* standard does not clearly establish the law governing when the use of deadly force is lawful. In an "obvious case," *Garner*'s general test can "'clearly establish' the answer, even without a body of relevant case law." *Brosseau*, 543 U.S. at 199. We recently held in *Hughes* that an officer was not entitled to qualified immunity for his shooting of an individual in part because, when the facts were construed in the plaintiff's favor, the officer's use of deadly force was "obvious[ly]" unlawful. 862 F.3d at 785 (internal quotation marks omitted). Resolving all factual disputes in favor of the plaintiff, at the time of the shooting the plaintiff in *Hughes* held a kitchen knife at her side as she calmly spoke to another person outside of her home. *Id.* at 778. The plaintiff had not responded to an officer's rapid demands to drop the knife, but there was also no indication that the plaintiff had understood the commands of the officer, who was on the other side of a fence. *Id.* We held that, taking the facts of that case taken in the light most favorable to the plaintiff and comparing them to the facts in available precedent involving excessive force, no officer could have reasonably believed that the plaintiff posed a risk of serious injury or death. The plaintiff's "right to walk down her driveway holding a knife without being shot" was clearly established. *Id.* at 785.

Unlike in *Hughes*, here we conclude that Deputy Barry's use of force was not obviously unlawful. Indeed, construing the facts in Isayeva's favor, there are strong reasons to believe that Tereschenko posed a risk of death or serious injury to the officers or to the family members in the home. First, Tereschenko clearly had the upper hand in the fight. After being tased—which failed to immobilize

Tereschenko—Tereschenko had succeeded in freeing both of his arms, in pushing Deputy Gray, and in pummeling Deputy Barry to the point that he began to pass out. Deputy Gray had tried without success to use a chokehold to subdue Tereschenko, but Tereschenko just threw him off. Tereschenko's repeated hits to Deputy Barry's head and face left the deputy with facial bruises and a minor head injury. Even under the view of the facts most favorable to plaintiff, Tereschenko was winning this fight, and was doing so quickly, highlighting the risks to Deputy Barry.

That Deputy Barry began to pass out when he was being beaten turned this dangerous fight into a potentially deadly one. If a police officer is knocked out during a struggle, it increases the risk to the officer and others because it gives the attacker an opportunity to hit the officer no longer able to defend himself, or to grab the officer's gun. Deputy Barry testified that if he "got knocked out, [he] feared [Tereschenko] was going to kill [the deputies]." Had Tereschenko landed a few more blows before Deputy Barry fired at him, Tereschenko could have either beat him while defenseless, potentially causing serious injury, or gotten hold of his firearm. The record does not show that Tereschenko at any point tried to take Deputy Barry's gun, but the possibility that he may have done so if Deputy Barry lost consciousness underscores the high risks posed by the violent situation as perceived objectively by a reasonable officer.

Furthermore, the deputies had information that made Tereschenko more threatening than indicated by his physical abilities alone. Tereschenko was likely under the influence of methamphetamine or some other drugs, and so was possibly less able to control himself. Once Deputy Barry began to pass out, the possibility that Tereschenko might

lack the self-control to stop himself from seriously injuring or killing the deputies made the situation more dangerous. Tereschenko's earlier mention of voices in his head talking about family members killing Isayeva also raised the threat level. The government interest in using force is usually less strong when an individual is mentally ill, *see Deorle*, 272 F.3d at 1283, but here Tereschenko's apparent mental condition led him to recount homicidal voices, and the knowledge of that fact would increase the perceived threat to any reasonable officer.

Other factors support that Deputy Barry's use of deadly force was not obviously unlawful. Deputy Barry yelled "Shoot him" before firing, and there is no reason to think that Tereschenko did not hear the deputy. These words gave notice to Tereschenko that more struggle could result in gunshots, making Deputy Barry's use of force more reasonable under the Fourth Amendment. *See id.* at 1282.

The officers also had no reasonably effective alternative to deadly force. *See Glenn*, 673 F.3d at 876. Using physical force against Tereschenko plainly did not work; the officers were quickly losing in hand-to-hand combat. By the time of the shooting, Deputy Barry had already tried tasing Tereschenko, and it seemed to only make Tereschenko more angry and aggressive. Deputy Barry carried pepper spray, but using it in such close proximity to Tereschenko and Deputy Gray could have backfired, either by further enraging Tereschenko, as did the tasing, or by incapacitating the deputies as much or more than incapacitating Tereschenko. Deputy Gray testified that he did not carry pepper spray on the day of the incident precisely because "it just irritates people more and gets all over myself and my partners more than the person that we are trying to apply it to." Escaping and calling for backup was also not a practical

option. Being close to unconsciousness, Deputy Barry likely could not escape himself, and if Deputy Gray tried to leave the room, Deputy Barry would have been left alone in serious danger. Deputy Barry was ultimately "forced to make [a] split-second judgment[]—in circumstances that [were] tense, uncertain, and rapidly evolving—about the amount of force that [was] necessary." *Graham*, 490 U.S. at 397.

Nor does our own precedent clearly establish that Deputy Barry's use of deadly force was unreasonable. Isayeva cites only one case from our circuit where an officer was involved in hand-to-hand combat with an individual, the officer used deadly force, and we held that the force used was excessive. *See Hopkins v. Andaya*, 958 F.2d 881 (9th Cir. 1992), *as amended* (Mar. 24, 1992) (per curiam). In *Hopkins*, when the record was construed in favor of the plaintiff, the fight involved the decedent hitting the officer once or twice to the arm or head, and the officer suffering only a minor cut on his arm and bruises on his elbow, back, and leg. Yet, without warning, the officer shot the decedent. *Id.* at 884, 886. We concluded that the officer "was never in any serious danger" and that the use of deadly force was unreasonable. *Id.* at 886. Unlike the present case, the decedent in *Hopkins* at no point had the upper hand in the fight, and the officer never came close to passing out. The decedent in *Hopkins* posed a much lesser threat to officer and citizen safety than did Tereschenko. *Hopkins*, like *Garner*, does not clearly establish that Deputy Barry's use of deadly force was unlawful.

The above discussion shows that not only was it not obvious that Deputy Barry's use of deadly force was excessive, but that there are strong reasons supporting the reasonableness of the shooting. We conclude that under the

circumstances of this case, *Garner* does not clearly establish Tereschenko's right to be free from deadly force by Deputy Barry. Though our analysis discussed factors relevant to whether Deputy Barry's use of deadly force was reasonable, we reach no conclusion on that issue. *See Pearson*, 555 U.S. at 236. Instead, we rest our holding on the second prong of qualified immunity, that Tereschenko held no clearly established right not to be shot by Deputy Barry.

**V**

We hold that Deputy Sean Barry is entitled to qualified immunity for the tasing and fatal shooting of Paul Tereschenko. This disposes of the federal claim that excessive force in violation of the Fourth Amendment was used by Deputy Barry. Because state law claims remain pending, we remand for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**